IN THE MATTER OF THE PETITION OF DANIEL VAN
WINKLE FOR A WRIT OF HABEAS CORPUS.

Argued October 31, 1949—Decided January 3, 1950.

Mr. *Peter J. McGinnis* argued the cause for appellants (*Messrs. Ward, McGinnis & Friedman,* attorneys).

Mr. *Thomas J. Kennedy* argued the cause for the respondent (*Messrs. Murner & Murner,* attorneys).

The opinion of the court was delivered by

BURLING, J. This is an appeal by Robena Van Winkle and Joseph Greendyke, co-guardians of Daniel Van Winkle, to review an order dated August 19, 1949, of the Passaic County Court for the issuance of a writ of *habeas corpus ad*

*subjiciendum* and the judgment entered pursuant thereto by said Court on August 25, 1949. The appeal is addressed to the Appellate Division of the Superior Court but has been certified by the Supreme Court on its own motion. *Rule* 1:5–1(a).

On June 16, 1947, by an inquisition pursuant to a commission *de lunatico inquirendo* issued out of the former Court of Chancery, Daniel Van Winkle was found to be an habitual drunkard and incapable of managing himself or personal property and real estate of which he was seized. These proceedings were confirmed by the Court of Chancery on July 1, 1947. Shortly thereafter Robena Van Winkle, who is the aunt of Daniel Van Winkle, and Joseph Greendyke were appointed co-guardians of Daniel Van Winkle by the Judge of the Orphans Court of Passaic County.

On November 17, 1948, pursuant to a petition filed by the co-guardians, an order was made by the County Court of Passaic County confining Daniel Van Winkle as an insane person in the New Jersey State Hospital for the Insane at Greystone Park, in Morris County, New Jersey, to which institution the said Daniel Van Winkle had been committed on October 23, 1948. The order provided that the said Daniel Van Winkle be confined "until he be restored to reason, or removed or discharged, according to law;".

On August 18, 1949, while Daniel Van Winkle was confined to Greystone Park, he signed a petition for a writ of *habeas corpus ad subjiciendum* addressed to the Passaic County Court charging that his detention was illegal.

On August 19, 1949, the Judge of the Passaic County Court made an order for the issuance of a writ of *habeas corpus* returnable before him on August 25, 1949, which order provided that notice be given to Robena Van Winkle and Joseph Greendyke, co-guardians of said Daniel Van Winkle, they being the persons upon whose application Daniel Van Winkle was committed to Greystone Park.

On August 22, 1949, a writ of *habeas corpus* issued out of Passaic County Court directed to Marcus A. Curry, Medical Superintendent and Chief Executive Officer of the New Jersey

State Hospital at Greystone Park, Morris County, New Jersey, commanding him to have the body of Daniel Van Winkle before the Judge of the Passaic County Court on August 25, 1949.

On August 25, 1949, a hearing was held by the Judge of the Passaic County Court pursuant to the writ of *habeas corpus*. Counsel for the co-guardians objected to the jurisdiction of the Court and offered no testimony at the hearing; although he did cross-examine the Senior Resident Physician of Greystone Park who testified that Daniel Van Winkle was not insane at the time of the hearing on August 25, 1949. The only testimony offered being that Daniel Van Winkle was then sane, the Judge of the Passaic County Court entered a judgment that Daniel Van Winkle was then sane and ordered his discharge forthwith.

Appellants ground their appeal on the theory that the County Court of Passaic County had no jurisdiction to issue a writ of *habeas corpus* directed to the Medical Superintendent of Greystone Park because (a) the case is a civil matter and (b) Greystone Park is situated in Morris County, and that therefore the judgment entered on August 25, 1949, is void. Appellants contend that the County Courts, which have been invested with the jurisdiction of the former Common Pleas Courts under the 1947 Constitution, are limited to the issuance of writs of *habeas corpus* in criminal cases where the person is confined within the county. They contend that there is no jurisdiction in said courts to issue such a writ except as is given by *R. S.* 2:82–14 which provides as follows:

"The power and authority to issue writs of *habeas corpus* shall be and reside in:

a. The supreme court during its sitting, or the chief justice or an associate justice, at chambers during any term or vacation of the supreme court;

b. The judge of a court of common pleas, who shall have concurrent jurisdiction in his county with the justices of the supreme court to grant such writ in all criminal cases where a person may be confined in prison or detained in custody, and to hear and determine the same in like manner as though the application had been made before a justice of the supreme court."

It is advanced on behalf of the respondent that, (1) the Passaic County Court had jurisdiction to issue the writ of *habeas corpus,* to adjudicate the question of respondent's sanity; and to order his discharge; (2) the question of the court's jurisdiction is now academic and (3) the appellants have no standing to appeal because they are not aggrieved by the decision.

We shall proceed first to determine the question of the jurisdiction of the County Court to issue the writ of *habeas corpus.* Respondent's contention that the County Court had jurisdiction to issue the writ of *habeas corpus* is based upon the following reasoning: The County Court is the successor to the former Court of Common Pleas. The latter mentioned court succeeded to all rights inherent in the English Court of Common Pleas; *habeas corpus* was a common law writ; the Court of Common Pleas in England had the common law right to issue the writ and that, *ergo,* the present County Courts have the inherent common law right to issue such writ.

An examination of the law and the history of our County Courts leads us to a contrary conclusion. By the 1947 Constitution and legislation thereunder, the jurisdiction of the Court of Common Pleas was preserved and made to form a part of the jurisdiction of the County Court. 1947 *Constitution, Art. VI, Sec. I, Par.* 1, *Art. VI, Sec. IV, Par.* 1, *Art. XI, Sec. IV, Pars.* 2, 4, *Art. XI, Sec. I, Par.* 2, *P. L.* 1948, *c.* 365. The County Court, accordingly, has been invested with the jurisdiction of the former Common Pleas Court, as well as of the former Orphans Court, Court of Oyer and Terminer, Court of Quarter Sessions and Court of Special Sessions. The Common Pleas Court, the origin of which is traced to the ordinance of Lord Cornbury in 1704, was preserved inferentially by the 1776 *Constitution, Art. XII,* and was retained by the 1844 Constitution, since at the time of the adoption of that constitution it was one of the "inferior courts as now exist." 1844 *Constitution, Art. VI, Sec. I, Par.* 1. Since the County Court is presently vested with the jurisdiction of the former Common Pleas Court it becomes necessary in pursuing the problem to ascertain the nature

and extent of the common law jurisdiction of the Common Pleas Court and whether such jurisdiction included the right to issue a writ of *habeas corpus.* It has been determined by our courts that the Common Pleas Court was a constitutional court of record having general jurisdiction over common law actions *inter partes,* and proceedings thereon according to the course of the common law. See *Vanderveere v. Gaston,* 24 *N. J. L.* 818 (*E. & A.* 1854) ; *Caliopoulos v. Chagaris,* 2 *N. J. Misc.* 998 (*Sup. Ct.* 1924) ; *Sonzogni v. Sansevere,* 6 *N. J. Misc.* 675 (*Sup. Ct.* 1928). It has also been established that the writ of *habeas corpus* was a common law writ. *Dickinson ads. State Bank,* 16 *N. J. L.* 354 (*Sup. Ct.* 1838) ; *Vannalta v. Morris Canal and Banking Co.,* 17 *N. J. L.* 159 (*Sup. Ct.* 1839) ; *In re Thompson,* 85 *N. J. Eq.* 221 (*Ch.* 1915) ; *State v. Common Pleas Court of Mercer County,* 1 *N. J.* 14 (*Sup. Ct.* 1948) ; 39 *C. J. S. par.* 1, *p.* 424. That the English Court of Common Pleas had common law jurisdiction to issue the writ is not questioned. See *In re Thompson, supra,* wherein the subject is fully discussed and wherein the court quotes *Church, Hab. Corp.* (*2d Ed.*), § 61, as follows :

(At page 233) "The origin of this (common law) jurisdiction over the writ of *habeas corpus* is lost in antiquity. It was, we have seen from the history of the writ, undoubtedly exercised before Magna Charta, and it extends to all cases of illegal imprisonment, whether claimed under public or private authority. It was exercised by the court of chancery, king's bench, common pleas, and exchequer, * * *."

The inquiry then to be pursued is whether the common law powers and jurisdiction of the English Court of Common Pleas to issue a writ of *habeas corpus* had ever become a part of the general common law powers and jurisdiction which vested in our former Court of Common Pleas. Such inquiry leads to a negative determination.

*Keasbey, Courts and Lawyers of New Jersey, Vol. 2, p.* 545, contributes the following statements on the subject :

"It was to the Supreme Court that was expressly given the jurisdiction of the Court of Common Pleas of England. The Court of Common Pleas of New Jersey had that jurisdiction only insofar as

it was constituted a common law court of civil jurisdiction between party and party. It was expressly deprived of the right to try title to lands, which was originally the special function of the English Court of Common Pleas..

"The name of Common Pleas was first given to the County Court of civil jurisdiction in New Jersey in the first ordinance of Lord Cornbury in 1703, and the name was not taken directly from the English Court, but from a court already existing in New York."

A history of the origin and jurisdiction of the Common Pleas Court in this State is given in one of our early cases, *State, Dufford, Pros., v. Decue,* 31 *N. J. L.* 302 (*Sup. Ct.* 1865), wherein it is related that the Common Pleas Court was a Provincial Court established by Ordinance of Lord Cornbury, in 1704, which ordinance declared:

(At page 304) " 'that the several and respective Courts of Pleas hereby established, shall have power and jurisdiction to hear, try, and finally determine all actions or causes of actions, and all matters and things tryable at common law, of what nature or kind soever.' And it is further provided, 'that there shall be held and kept at the cities or towns of Perth Amboy and Burlington, alternately, a Supreme Court of Judicature, which Supreme Court is hereby fully empowered to have cognizance of pleas civil, criminal, and mixed, as fully and amply, to all intents and purposes whatsoever, as the Courts of Queen's Bench, Common Pleas, and Exchequer, within her majesties kingdom of England, &c.' "

At page 305. of the aforesaid case, it is said:

"the ordinary common law original jurisdiction of the Supreme Court was shared by the respective County Circuit Courts, and to a definite extent by the Courts of Common Pleas; but the appellate and extraordinary jurisdiction with which the Supreme Court, as the successor of the King's Bench, had been originally vested, remained centered still exclusively in that tribunal * * *."

It will be observed that the jurisdiction given to the Supreme Court was explicit and more extensive than was given to the Common Pleas Court, and included the appellate and extraordinary jurisdiction of the several English courts. *Habeas corpus* is an extraordinary writ. It has been considered to be a high prerogative writ issuable not as a matter of right but in the discretion of the issuing authority. *In re Thomp-*

*son, supra; In re Davis,* 107 *N. J. Eq.* 160 (*Ch.* 1930) ; *State v. Court of Common Pleas of Mercer County, supra;* 39 *C. J. S., par.* 1, *p.* 424; 3 *Bl. Comm.* 131.

Further, it has been considered to be a common law writ which has been confirmed and regulated by statute. *In re Thompson, supra; In re Davis, supra.* It becomes appropriate therefore to examine the legislative treatment of the writ. The historical enactments were extensively reviewed by our courts in *State v. Garthwaile,* 23 *N. J. L.* 143 (*Sup. Ct.* 1851) ; *Patterson v. Slate,* 50 *N. J. L.* 421 (*E. & A.* 1888) ; *In re Thompson, supra.* Those cases impart a detailed chronology of the early relevant statutes. They reveal that the original *Habeas Corpus* Act in England, 31 *Car.* 11, *A. D.* 1679, applied only to treason and felony; that the first legislation on the subject in this State was passed in 1713 and applied only to misdemeanors; that in 1795 our legislature repealed the 1713 Act and enacted the substance of the English *Habeas Corpus* Act but substituted for the words "high treason and felony" the terms "treason, murder, manslaughter, sodomy, rape, arson, burglary, robbery, forgery or larceny, or for rescues or voluntary escapes in any such case;" and that in 1799 an act relative to indictments was passed, which embodied the provisions of the English Act and the 1713 Act by extending the provisions of *habeas corpus* as well for misdemeanors as felonies. Chancellor Walker, referring to the 1795 Act, in *In re Thompson, supra,* at page 234, expressed the following informative language:

"Our statute of March 11th, 1795, did not create the writ of *habeas corpus* as a means of preventing the injury of illegal confinement, but recognized its existence and legislated with reference to it as a common law writ. It provided, in section 1, that whenever any person should bring a writ of *habeas corpus* directed to any sheriff or other person, that that officer or other person should make return to the writ and bring the body of the party committed or restrained before the chancellor for the time being, or the justices of the supreme court, or such of them before whom the writ was made returnable, according to the command thereof. In section 3 it was enacted that if any person be committed or detained (except, etc.) out of term and in vacation time, such person, or any one in his behalf, might apply to 'the chancellor, or any one of the justices of the supreme court; and

the said chancellor or justices, or any of them,' were authorized and required 'to award and grant a *habeas corpus* under the seal of such court, whereof he shall be then one of the judges' to be directed, etc., and in section 10 it was enacted that it should be lawful for any person to move and obtain his *habeas corpus*

" 'as well out of the court of chancery as out of the supreme court, and if the chancellor or any justice of the supreme court for the time being * * * shall deny any writ of *habeas corpus* by that act required to be granted * * * they shall severally forfeit to the prisoner,' etc."

Exploration of the subsequent legislation discloses that the 1795 Act was repealed by an Act passed in 1874 (*Rev. 1877, p. 468, C. S., p. 2640, par. 3,* now *R. S. 2:82–14*) which limited the application for the writ to the Supreme Court when sitting, or to one of the justices thereof, otherwise. This Act did not provide for an application to the Chancellor as did the 1795 Act, but by Laws of 1878, *c. 236, par. 1 (C. S., p. 2640, par. 3a,* now *R. S. 2:82–58*), the Chancellor was declared to have and to have had power to issue the writ and to hear and determine the same. See also *In re Thompson, supra,* for a discussion of the inherent right of our former Chancery Court, as the prototype of the English High Court of Chancery, to issue the writ. *Laws of 1885, c. 219, par. 1 (C. S. 2640, par. 3b—*now *R. S. 2:82–14, supra*) provided that the judge of a Court of Common Pleas shall have concurrent jurisdiction in his county with the Justices of the Supreme Court to grant the writ in criminal cases. This appears to be the only legislative action with reference to the issuance of the writ of *habeas corpus* in which the Common Pleas Court is mentioned. It is significant that this latter statute contains definite limitations, whereas the earlier statutes referring to the jurisdiction of the Supreme Court and the Chancery Court to issue the writ contained no words of limitation with respect to the nature of the cases in which the writ could issue. Previous explicit judicial expression has not been cited, nor has any been found upon this subject excepting in the case of *Orbey v. Wright,* 37 *N. J. L. J.* 50 (*C. P.* 1914), which held that the jurisdiction of the Common Pleas Court to issue the writ was *conferred* by statute and

limited to criminal matters. No reference has been found in any statute or judicial decision respecting the jurisdiction of the Common Pleas Court to issue the writ beyond the jurisdiction referred to in *R. S.* 2:82–14, *supra*.

*P. L.* 1898, *c.* 135, *par.* 1 (*C. S.* 2646, *par.* 31a—now *R. S.* 2:82–50), provides as follows:

> "A justice of the Supreme Court or other judicial officer awarding any writ of *habeas corpus* sued out by or on behalf of any person confined in any hospital for the insane or lunatic asylum in this state shall assign a place and a short day for the return of the writ and require the person suing out the writ to give such notice, as the justice or judicial officer shall direct, to the party upon whose application such person was committed to the hospital or asylum, of the issuance of the writ and the time and place of its return.
>
> "Upon the return thereof, the fact of the sanity or insanity of the person so detained shall be inquired into, and the party who procured the commitment of the insane person to the hospital or asylum, as well as the insane person, and also the medical director or other head officer of the hospital or asylum wherein any such person is confined, shall be entitled to appear and be heard on the return of the writ."

It will be observed that this statute refers to "a justice of the supreme court or other judicial officer" without any clarification as to who might be the "other judicial officer." The terminology "other judicial officer" does not include the judge of the Common Pleas Court. The observation by the Vice-Chancellor in the case of *In re Hannah,* 76 *N. J. Eq.* 237 (*Ch.* 1909), that

> (At page 240) "If Mr. Hannah has been restored to reason and the authorities of the institution in which he is confined refuse to discharge him, he may be enlarged on *habeas corpus,* and the proceedings may be had before the judge of a common law court, or this court. *P. L.* 1898, *p.* 231; *In re Lee,* 55 *A.* 107."

does not justify such a holding. It would seem that the legislative reference to the judicial officers, "a justice of the supreme court or other judicial officer" was merely descriptive of those who possessed the general power to issue writs of *habeas corpus*. Further, *P. L.* 1918, *c.* 147, *par.* 450, *Supp.* 1924 (*R. S.* 2:82–54), provides for the release from a mental institution by *habeas corpus* but does not indicate to

whom application should be made. It is noteworthy that all applications for discharge, pursuant to this statute, in our reported cases, have been made to the Chancery Court. *In re Hannah, supra;* *Allgor v. New Jersey State Hospital,* 80 *N. J. Eq.* 386 *(Ch.* 1912); *In re Streeper,* 92 *N. J. Eq.* 653 *(E. & A.* 1921); *In re Streeper,* 93 *N. J. Eq.* 102 *(Ch.* 1921); *In re Taylor,* 104 *N. J. Eq.* 296 *(Ch.* 1929); *Ex parte Perry,* 137 *N. J. Eq.* 161 *(Ch.* 1945); *Ex parte R. R.,* 140 *N. J. Eq.* 371 *(Ch.* 1947); *Cf. Rule* 3:40–2.

■ The history of the establishment of our courts, the prerogative nature of the common law writ of *habeas corpus* and a review of the legislative enactments and reported decisions thereunder lead to the conclusion that the only authority invested in the Common Pleas Courts to issue a writ of *habeas corpus* is to be found in *R. S.* 2:82–14 *supra,* which confers limited and specifically defined jurisdiction. The County Courts have succeeded to such limited jurisdiction. It follows that the Passaic County Court was without authority to issue the writ of *habeas corpus* in the present case.

The second contention urged by the respondent is that the question is now academic. This question will be considered. *P. L.* 1918, *c.* 147 *(R. S.* 30:4–23 *et seq.*) makes provisions for the application for commitment of persons to the institutions therein mentioned and the proceedings incident thereto. It provides, *inter alia,* for a hearing before and commitment by a "judicial officer." *R. S.* 30:4–23 defines a "judicial officer" to include Common Pleas judges. *R. S.* 30:4–56 provides that the judicial officer shall make an order of commitment, containing a determination of insanity, "until restored to reason or discharged, or until the further order of a court of competent jurisdiction." *R. S.* 30:4–59 permits the judicial officer, under certain circumstances, to commit the patient to an institution owned by another county or by the state. The commitment in the present case appears to have been accomplished pursuant to the provisions of the statute. As hereinafter stated, the order of commitment provided that respondent be confined "until he be restored to reason, or removed or discharged according to law." The Senior Resi-

dent Physician of the New Jersey State Hospital for the Insane at Greystone Park, testified at the hearing, on August 25, 1949, that the respondent was then sane.

*R. S.* 30:4–107 provides:

"A patient admitted to any institution in this state, other than a correctional institution, whether upon final order of commitment or otherwise may be paroled or discharged therefrom in accordance with the rules and regulations prescribed by the board of managers or the board of chosen freeholders or the proper committee thereof, as the case may be. In all cases where the patient shall have been transferred to the institution from a correctional institution he shall not be paroled or discharged prior to the expiration of the minimum period of detention."

It does not appear whether any such rules and regulations were ever adopted by the board of managers of the State Hospital at Greystone Park and the respondent's discharge was not sought or effected through the above statutory medium. By virtue thereof it becomes unnecessary to construe the statute to determine whether the respondent's discharge might have been effected without the necessity of a judicial proceeding.

We must direct our attention, therefore, to the question of the jurisdiction of the County Court to order the respondent's discharge. We have determined that the County Court's issuance of the writ of *habeas corpus* was without authority, but since all of the interested parties appeared in court, pursuant to the mandate, and submitted to the jurisdiction and the matter was heard upon the merits, no question can now be raised with respect to the nature of the process or the fact that it was directed to someone outside of the court's territorial jurisdiction, if the Court had jurisdiction otherwise to dispose of the matter. *State, Baird, Pros. v. Baird and Torrey,* 19 *N. J. Eq.* 481 (*E. & A.* 1868) ; 25 *Am. Jur., par.* 107. In the present case, the Passaic County Court had jurisdiction of the subject matter. A court has inherent power to maintain its jurisdiction and render it effective to determine every question properly arising and to grant full relief. 21 *C. J. S., p.* 134 *et seq. R. S.* 30:4–56 permits the discharge

of a person from an institution to which he has been committed by a "court of competent jurisdiction." The County Court in the circumstances before us, having committed the respondent and having jurisdiction of the subject matter, was such a "court of competent jurisdiction."

The final question to be determined relates to the right of the co-guardians to make the present appeal.

In the brief of the appellants, the appeal is predicated on the basis of *R. S.* 2:82–48.1 (Chapter 238 of the Laws of 1949). This statute relates to appeals in proceedings involving writs of *habeas corpus*. Since the appellants advanced and we have held there was no authority to issue the writ of *habeas corpus*, no status is acquired by them under the cited statute to pursue the appeal. The notice of appeal appears to be broad enough to otherwise attack the jurisdiction and the order of the County Court which declared the sanity and ordered the discharge of the said Daniel Van Winkle. Appeal is to the Appellate Division by virtue of Art. VI, Sec. 5, Par. 2, Constitution of 1947, *Rule* 4:2–1(b) and Chapter 365 of the Laws of 1948 (*R. S.* 2:1B–22) from such an adjudication.

It is urged by the respondent that the appellants are not aggrieved persons within the meaning of the statute, *R. S.* 2:27–355, which is superseded by the above mentioned statute, Chapter 365 of the Laws of 1948 (*R. S.* 2:1B–22) and the definition of an "aggrieved person" as set forth in *Eugster v. Eugster,* 89 *N. J. Eq.* 531 (*E. & A.* 1918). This case was cited with approval in *In re Lent,* 142 *N. J. Eq.* 21 (*E. & A.* 1948). The *Eugster case* defined an "aggrieved person" as "one whose personal or pecuniary interests or property rights, have been injuriously affected by the order or decree." Proceedings to effect the discharge of a patient from a State hospital on the ground of present sanity, have no effect upon the appointment or discharge of a guardian. The former seeks to determine the justification of confinement while the latter is concerned with the question of whether the person confined or discharged is sufficiently able to manage himself and his affairs. *In re Streeper,* 93 *N. J. Eq.* 102 (*Ch.* 1921). See *Rule* 3:91–7.

However, *R. S.* 3:7–41 recites the duties of a guardian appointed after adjudication resulting from the commission *de lunatico inquirendo,* as follows:

"Thereupon, the orphans' court shall, upon application therefor, appoint some fit person or persons as guardian or guardians of the mental incompetent. The guardian so appointed shall have the care and safekeeping of the mental incompetent and his real and personal property so that the mental incompetent may live and be competently supported and maintained by and out of his personal property and the profits of his real estate. * * *"

 Since the guardians are charged with the care and safekeeping of the mental incompetent under the provisions of the pertinent statute, the appellants acquire a status as an aggrieved party for the purpose of invoking the appeal. Upon the facts the respondent has been determined upon uncontradicted evidence to be presently sane. The appellants offered no evidence to the contrary and contented themselves with the cross-examination of the witness otherwise produced and raising the question of jurisdiction. If a re-commitment should in the future be considered necessary, application may be made for that purpose in appropriate proceedings.

For the reasons stated herein, the judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.